**William HAEBERLE and John W. Magee, Jr., Trading as Villanova Leasing Company, William Haeberle and Harman S. Spolen, Trading as Wayne Leasing Co. and William Haeberle and Oliver Vanderbilt, Trading as Windsor Leasing Company, Plaintiffs-Appellants,**

v.

**TEXAS INTERNATIONAL AIRLINES, Defendant-Appellee.**

No. 83–2087.

United States Court of Appeals, Fifth Circuit.

Aug. 20, 1984.

Rehearing Denied Oct. 3, 1984.

Drinker, Biddle & Reath, Lawrence J. Fox, Philadelphia, Pa., Stradley, Barnett & Stein, William J. Stradley, James Douglas Ogle, Houston, Tex., for plaintiffs-appellants.

Sowell & Ogg, Michael L. Landrum, Jack C. Ogg, Houston, Tex., for defendant-appellee.

Before BROWN, GEE, and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The best language is but a mean method of conveying thought with precision. Despite the imprecision of words, however, the purpose of embodying an agreement in a formal document is to substitute a single written declaration, whatever the hazards of its interpretation, for the uncertainties and vicissitudes inherent in an effort to define in any fashion what two parties have agreed upon. The extrinsic evidence rule precludes the use of extraneous evidence to vary the terms of a writing intended to be an integrated contract. When the words of the contract, considered in the context of the transaction, are susceptible of but one reasonable interpretation, the meaning of the words is a question for the court, and the jury need not hear extraneous evidence of the parties' intent. When the words are susceptible of different interpretations, however, either because their meaning when read alone is unclear or because apparent lucidity is muddied by evidence of a different meaning arising from the circumstances under which the agreement was negotiated, states following the rule admit extrinsic evidence to explain and clarify the formal statement.

The trial court found the terms of an airplane-leasing contract clear and unambiguous with regard to the lessee's maintenance obligations and excluded evidence that the parties may have intended a different meaning than the one found by the court. Adopting the controlling state-law rule in this diversity case, we find that the court erred in excluding all evidence dehors the contract and, considering the evidence we hold admissible, we find the contract susceptible to several reasonable alternative constructions. We therefore reverse the judgment and remand the case for retrial so that a jury may determine first what were the lessee's obligations and then whether the lessee breached them.

## I.

In 1968, Texas International Airlines (known then as Trans Texas Airways)[1] sold three Convair 600 airplanes for $925,000 each, one to each of three limited partnerships operating under the names Wayne Leasing Company, Windsor Leasing Company, and Villanova Leasing Company ("the partnerships"). The aircraft were then twenty years old, but they had recently been rebuilt; new engines, propellers, auxiliary power units, fuel systems, cockpit instrumentation, and other new equipment had been installed.

Shortly thereafter, the partnerships leased the three airplanes to Systems Capital Aircraft, Inc. Systems Capital, in turn, leased them back to Texas International Airlines for ten years for $1,236,512 each.[2] Thus a sale and leaseback were accomplished.

In 1975, the partnerships and Systems Capital entered a novation agreement under which the partnerships assumed all of

---

**1.** Throughout this opinion, we will refer to the airline as Texas International, regardless of the name it used at the referenced time.

**2.** Each sublease provided for thirty-six quarterly payments of $34,142 followed by the final four quarterly payments of $1,850, a total of $1,236,512. If the rent payments were discounted to their then "present value," the price for each plane would exceed the value of the rent. But if tax advantages to the partnerships in the form of investment tax credit and depreciation deductions are considered, then the price might be equal to the benefits received by the partnerships—perhaps even if the planes were worthless when the leases expired.

Systems Capital's rights and duties under the three identical contracts by which it had subleased the airplanes back to Texas International. The partnerships then became direct lessors of the aircraft to Texas International, their original owner.

The subleases contained extensive provisions regarding maintenance of the airplanes and their condition upon return. They provided, *inter alia:* "Except if [Texas International] exercises its options as provided herein, upon termination of [the subleases], the leased property will be returned to [the partnerships] in its original condition (reasonable wear and tear excepted)"; "[Texas International] will, at its own expense, be responsible for the readying for use, use and maintenance of the leased property and will make all necessary replacements and repairs. All such replacements and repairs shall become the property of [the partnerships]"; "[Texas International] will operate and maintain the Leased Property with maintenance practices and procedures meeting all requirements of the Federal Aviation Administration"; and "[At its own] sole cost and expense, [Texas International] will accomplish FAA Airworthiness Directives applicable to the Leased Property; and accomplish the licensing and relicensing of said Leased Property as required by the FAA or other appropriate governmental authorities."

When the leases expired in 1978, Texas International informed the partnerships that it had taken the leased aircraft out of service in 1976 and 1977, stored the airframes in the Arizona desert, and removed and stored elsewhere the engines, propellers, auxiliary power units and other major components. Texas International offered evidence that all components were prepared for storage and stored in conformity with the procedures recommended by their manufacturers. While the airframes and components were in storage, however, no ongoing maintenance, repairs, modifications, or overhauls were performed by Texas International. The partnerships eventually sold each of the airplanes in its "as is, where is" condition for $133,333.

The partnerships sued Texas International for breach of the subleases. They alleged that the airline had, by dismantling and storing the airplanes and thereby ceasing regular operation and maintenance, neglected the aircraft and rendered them less valuable at the expiration of the lease term than they would have been if operated and maintained in accordance with the contracts. They contended that the subleases required Texas International to return the airplanes in "zero time condition," a phrase used in the airline industry to mean, in essence, freshly overhauled. Arguing that the language of the contract is ambiguous with respect to whether the airplanes' components were required to satisfy zero time or other specific overhaul standards upon return, the partnerships sought to establish before trial that the testimony of three negotiators—"contemporaneous parol evidence"—would be admissible to clarify the subleases. The trial court entered the following pretrial order without further explanation: "having considered the motion, the arguments of counsel, the record and the law [, the court] concludes that the sublease is 'clear and unambiguous' and that the motion shall be ... DENIED." The clear and unambiguous meaning discerned by the trial court is reflected in its charge to the jury:

> The Defendant was required by the lease to return the aircraft to the Plaintiffs in their original condition (reasonable wear and tear excepted). The Defendant was also responsible for making all necessary overhauls, replacements and repairs on the aircraft regardless of whether the aircraft were being operated or were in storage. The Defendant was further required to operate and maintain the aircraft so as to meet all requirements of the FAA.

> Stated another way, the term of the lease was 10 years and during that period the three aircraft, engines and other parts, would through normal use and aging, experience some wear and deterioration. So the Defendant was not required to keep or return the aircraft, including the

engines, propellers and other parts in perfect condition, but it was required to use, keep or store them in a reasonable and prudent manner, to overhaul or make repairs or replacements when due and return the aircraft to the Plaintiffs in an airworthy condition. If overhauling, repairs or replacements were required, it could not avoid overhauling or making those required repairs or replacements by putting the aircraft, the engines or other parts into storage and keeping them there until the lease expired. Similarly, if it removed good working parts from the leased aircraft that were in storage and used them as replacement parts on its own operating aircraft, it would be obligated to replace those parts with parts in similar good order (with like time remaining) before returning the aircraft to the Plaintiffs. There has been considerable evidence introduced concerning overhauling, repairs and replacements of various parts on the three aircraft after the termination of the lease. The Defendant is not necessarily liable for the overhauling or for the repairs or replacements that were made on the aircraft after the termination of the lease, but only for such overhauling or repairs or replacements that should have been made by the Defendant under the lease agreement before returning the aircraft to the Plaintiffs.

The jury returned a verdict for the defendant, Texas International, answering "we do not" to the question, "Do you find from a preponderance of the evidence that the Defendant failed to use or maintain the three aircraft in question as required by the lease agreement?" The court denied the partnerships' motion for judgment notwithstanding the verdict and entered judgment for Texas International. The partnerships challenge this ruling as well as the order excluding parol evidence.

## II.

■ The law of Pennsylvania, made applicable to this dispute by a provision of the subleases, forbids the admission of extraneous evidence to vary or contradict the terms of a written contract. The state supreme court has stated its rule thus:

> Where [a writing] purports to contain the entire agreement between the parties, and there is no averment and proof that anything was omitted therefrom by fraud, accident or mistake, all prior negotiations and verbal agreements are merged in and superseded by the subsequent written agreement and parol evidence is inadmissible to alter, contradict, vary, subtract from or add to the written agreement.

*In re Estate of Fessman,* 386 Pa. 447, 126 A.2d 676, 677–78 (1956).[3]

This rule does not, however, forbid the admission of evidence to establish the intended meaning of written contract terms.[4] External evidence of the parties' mutual intent, such as testimony regarding prior or contemporaneous negotiations, is admissible to aid interpretation of ambiguous written terms.[5] Although "[n]o parol evidence ... can be said to vary or contradict a writing until by process of interpretation it is determined what the writing means,"[6] the jury plays no role in this process unless the writing is susceptible of more than one reasonable interpretation.[7] Therefore, the

**3.** *Accord* 3 A. Corbin, *Contracts* § 573, at 357 (2d ed. 1960); Note, *A Critique of the Parol Evidence Rule in Pennsylvania,* 100 Pa.L.Rev. 703, 704 (1952).

**4.** *E.g., In re Estate of Fessman,* 126 A.2d at 678; *Pavlich v. Ambrosia Coal and Construction Co.,* 441 Pa. 210, 273 A.2d 343, 345 (1971); *see generally* Corbin, *The Interpretation of Words and the Parol Evidence Rule,* 50 Cornell L.Q. 161, 170–71 (1965).

**5.** *Northbrook Insurance Co. v. Kuljian Corp.,* 690 F.2d 368, 372 (3d Cir.1982) (applying Pennsylvania law in diversity case); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1010–11 (3d Cir.1980) (same).

**6.** A. Corbin, *supra* note 3, § 579 at 412–13 (1960).

**7.** *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1010–11 & n. 10 (3d Cir. 1980). *Cf.* A. Corbin, *Contracts,* § 579 at 650–51, 654–55 (Supp.1984).

exclusion of testimony regarding what condition the parties intended their writing to require the airplanes to be returned in was proper if, but only if, the trial court correctly found that writing unambiguous in this respect. Our review of this finding is plenary because Pennsylvania treats ambiguity as a question of law for the court to decide.[8]

The Third Circuit has carefully reviewed the Pennsylvania precedents and determined that the clarity or ambiguity of a document should not be assessed from its four corners alone, but in the light of circumstances surrounding its adoption.[9] The court explained:

It is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The trial judge must then determine [whether] a full evidentiary hearing is warranted. If a *reasonable* alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the factfinder. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980) (emphasis in original).

This analysis follows the recommendation of the Restatement (Second) of Contracts, subsection 212(1): "The interpretation of an integrated agreement is directed to the meaning of the terms of the writing ... in the light of the circumstances ...." As comment b explains,

extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in context. Accordingly, the rule stated in subsection (1) is not limited to cases where it is determined that the language used is ambiguous. Any determination of meaning *or ambiguity* should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transactions, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. (Emphasis added.)

The partnerships contend that the lease provisions are ambiguous in that they may reasonably be interpreted not only as described in the jury instructions but alternatively as imposing an obligation to return the aircraft with components in zero-time condition or in less-than-half-time condition.[10] The district court did not explain what led it to reject these alternatives. The ruling preceded the trial; it was made before the partnerships submitted depositions of the witnesses whose testimony was excluded and without the benefit of testimony. If, as these circumstances suggest, the trial court employed a "four corners"

---

8. *Vlastos v. Sumitomo Marine & Fire Insurance Co.*, 707 F.2d 775, 778 (3d Cir.1983); *Northbrook Insurance Co. v. Kuljian Corp.*, 690 F.2d 368, 371 (3d Cir.1982). "Analytically, what meaning is attached to a word or other symbol by one or more people is a question of fact.... Historically ... partly perhaps because of the fact that jurors were often illiterate, questions of interpretation of written documents have been treated as questions of law in the sense that they are decided by the trial judge rather than by the jury. Likewise, since an appellate court is commonly in as good a position to decide such questions as the trial judge, they have been treated as questions of law for appellate review." Restatement (Second) of Contracts § 212 comment d.

9. *Accord* A. Corbin, *supra* note 3 at 650–51, 654–55 (Supp.1984); *see generally* Corbin, *supra*

note 4. Wigmore calls the four-corners approach a "stiff formalism." 9 Wigmore, *Evidence* § 2470 (Chadbourn rev. 1981). "The truth had finally to be recognized that words *always* need interpretation; that the process of interpretation inherently and invariably means the ascertainment of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document." *Id.*

10. A component is said to be in zero-time condition immediately after overhaul or replacement because none of the use time before FAA-prescribed overhaul or replacement has elapsed. Similarly, a component is in half-time condition when half its FAA-regulated air time has elapsed.

approach to assessing ambiguity, its method was flawed.

The partnerships later submitted three depositions as an offer of proof during the trial, but the court immediately reaffirmed its exclusionary order. Travis Reed explained in his deposition that he negotiated the substance of the subleases with Texas International on behalf of Systems Capital, though the contract document was drafted by unidentified attorneys representing Systems Capital, the partnerships, and their lenders. During the deposition, Reed repeatedly recalled discussions with representatives of Texas International (including William Mackey) who gave oral assurances that the airplanes would be maintained in half-time condition or better. Reed's deposition did not relate these assurances to the contract term "reasonable wear and tear excepted" but more generally to maintenance provisions of the contract and the term "original condition."

The second deposition was that of William Mackey, who, as Vice President for Finance of Texas International, had negotiated the subleases with Reed. According to Mackey, he and Reed negotiated a $75,000 guaranteed-residual-value provision to ensure that the partnerships would realize an adequate return on their investment. Mackey explained that the two of them had discussed the fact that the airplanes would be obsolete upon expiration of the subleases and that their sale would probably realize only a limited scrap value of around $25,000, an insufficient amount to make limited partnerships an attractive investment. Consistent with anticipated obsolescence and mere scrap value, Texas International was to surrender the planes, according to Mackey, in simply "flyable" condition.

The third deposition was sworn by Michael McClurg, who represented Capital Management Company, an enterprise that provided equity capital to Systems Capital for the sublease transactions. As McClurg described his firm's role, "we were responsible for raising the equity capital that provided the down payment investment

.... We were responsible for properly forming and administering the limited partnerships that provided such equity capital. We were responsible for reviewing [on behalf of the partnerships] all of the legal documentation with respect to the leases and subleases ...." McClurg personally reviewed the written terms of the subleases. He recounted discussions among representatives of Capital Management, the partnerships, and Systems Capital regarding the provision governing return-condition of the airplanes. The substance of these discussions was that the partnerships' investment was adequately protected because all mechanical parts would be in original—zero time—condition upon return, while the airframes and interiors would be in the condition occasioned by reasonable wear and tear, such as frayed carpets, worn upholstery, and similar deterioration. McClurg acknowledged, however, that he had never participated in negotiations with Texas International and that he had no knowledge of discussions between Texas International and Systems Capital.

■ We have omitted discussion and consideration of statements regarding the deponents' intentions, contemplations, and understandings unless the depositions indicate that those thoughts were communicated to others. Evidence of intent may be considered in testing the reasonableness of alternative interpretations of a writing only when there is reason to believe the intent was shared. Therefore, notwithstanding the fact that intent is always subjective, it is relevant to the meaning of contract terms if objectively manifested for both parties' observation, ordinarily by simple expression, or if it bespeaks a mutual understanding. *See Lyons v. Cantor*, 363 Pa. 413, 70 A.2d 285, 287 (1950); *Melon Bank*, 619 F.2d at 1011. For this reason, McClurg's deposition must be disregarded in its entirety. His statements shed light on an understanding shared through discussions with every party to this complex transaction except the one sought to be bound: Texas International. Because the deposition does not suggest that the airline

knew anything about the discussions, they cannot demonstrate mutual understanding among the parties to the sublease. Nor can McClurg's statements fairly be read to describe a trade usage or course of dealing to provide context for the language of the subleases, for the partnerships concede that these were among the first commercial aircraft leases executed and no trade usage or course of dealing existed.

However, neither the sublease documents themselves nor Mackey's deposition provides a basis for finding unreasonable the understanding of the return-condition requirement reflected by Reed's deposition. Moreover, his deposition testimony provides objective support for his interpretation; for it recalls communication of that reading to Texas International during negotiation of the subleases.

Texas International argues that the phrase "original condition (reasonable wear and tear excepted)" is without ambiguity because of its customary meaning as a legal term of art.[11] It asserts that, under Pennsylvania law, a reasonable-wear-and-tear exception frees the lessee from any duty to repair deterioration due to normal use, even deterioration so extensive as to prevent further use. None of the Pennsylvania cases involve the leasing of airplanes, a kind of property that, by virtue of FAA regulation and the nature of its use, differs significantly from refrigerators, stoves, and houses.

As objective evidence of what the contract term might mean, its usage even in other contexts is certainly relevant to assessing whether the term is ambiguous when used in an airplane lease. Terms like "original condition (normal wear and tear excepted)" have a generally accepted meaning in the context of human affairs with which we are all familiar. However, terms whose meaning is clear in common usage may be obscure when applied to unfamiliar circumstances. In a lease involving commercial airplanes, the same words may indi-

cate a different intention because of the nature of the equipment and FAA maintenance and overhaul requirements. The common understanding of the layman may differ from the meaning the term has to a person conversant with the airline industry.

Few would suggest, for example, that the proper storage of a leased refrigerator in adequate working condition would breach the lessee's duty to maintain the appliance. In the airline industry, by contrast, storage even in adequate flying condition removes an airplane from its maintenance cycle. Unlike the refrigerator, use of an airplane may, by triggering mandatory overhaul requirements, cause the plane's condition to improve over what it would be if stored for the same period.

In the light of the special circumstances of commercial aviation and evidence of contemporaneous negotiations of the subleases, we cannot say that the district court's interpretation of them is the only reasonable one. The district court therefore erred by excluding parol evidence of objectively voiced intent and surrounding circumstances and by taking from the jury the interpretation of the language of the subleases. We must therefore remand the case for retrial.

The parties should be permitted to adduce any evidence of mutual intent or understanding, not only testimony about discussions during the negotiations. Testimony regarding whether the rental payments reimbursed the full value of the airplanes, including interest, for example, might reveal the return value necessary to make the transaction profitable for the partnerships. Tax regulations existing at the time might also shed light on what the parties sought to accomplish. These examples are not intended either to be exhaustive or to preclude exclusion on some other basis, but merely to suggest the range of relevant evidence that might help the jury determine what the subleases required to assure the condition anticipated by the par-

11. In support, the airline cites *United States Gypsum Co. v. Schiavo Bros., Inc.,* 668 F.2d 172, 177–78 (3d Cir.1982), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982) and the Restatement (Second) of Property, Landlord and Tenant § 12.2.

ties upon the return of the airplanes. After considering the evidence, the jury may read the contract to require either more or less of Texas International than the trial court's interpretation did. With the limited record on appeal, we cannot determine whether, or in which direction, its interpretation missed the mark.

### III.

Because our disposition of the extrinsic evidence claim requires a new trial, we do not address the sufficiency of the evidence to sustain the judgment in Texas International's favor (an issue that may not have been preserved for review) except to note that under the district court's interpretation of the subleases, the jury's verdict would be difficult to square with evidence of the airplanes' condition upon expiration of the subleases.

For these reasons, the judgment of the district court is REVERSED and the case is REMANDED.

GEE, Circuit Judge, dissenting:

Finding myself unable to join the court's eminently reasonable disposition of this appeal, I write briefly to explain why I cannot do so. My reason is that although the Court's decision works no inequity and is entirely sensible, I do not believe that it accords with the governing law, that of Pennsylvania—which is, as the authorities cited in the court's opinion demonstrate, a garden-variety version of the parol evidence rule.

The contract under examination specifies, in terms of art having common and well-settled legal meanings, the condition in which the three leased airliners in question were to be returned: "original condition (reasonable wear and tear excepted)." Like the trial judge, I see no ambiguity here.

The majority, however, remands for a determination whether these settled terms may not mean what they say because—as I understand the opinion—they were applied, not to such items as refrigerators, but rather to aircraft. With all deference, it seems to me that this should have been a concern of the drafters, not of ours. Rather than applying the legal terms actually used, our court instead decrees that the district court is to consider whether the parties to the subleases meant to say that the aircraft were to be returned in "zero time condition" or perhaps "half time condition." The court is to do so, moreover, by consulting the oral testimony of Travis Reed, which—as the majority notes p. 1440—seems more in the nature of an assertion that the subleases did not contain the language that he had negotiated than one regarding any established meaning in the aircraft market of the terms that the subleases did contain.

The world will little note nor long remember what the Fifth Circuit says about the meaning of the Pennsylvania parol evidence rule; thus I see no occasion to write at length. Such rules, to be sure, occasionally produce harsh results and mechanical outcomes such as the majority commendably seeks to avoid. They were adopted or enacted, however, with an intent to preclude what was seen as a greater evil: a fight in every contract dispute over what disparate private meanings the parties may have intended to place on clear language of established import. Believing that in avoiding the former evil the majority has fallen into the latter, more serious one, I respectfully dissent.