**GREYHOUND FINANCIAL CORPORATION, f/k/a Greyhound Leasing & Financial Corporation, a Delaware Corporation, Plaintiff,**

v.

**GRAND TRUNK WESTERN RAILROAD COMPANY, a Michigan and Indiana Corporation, Defendant.**

**No. 90–CV–71146–DT.**

United States District Court, E.D. Michigan, S.D.

Jan. 29, 1992.

James A. D'Agostini, Bloomfield Hills, Mich., for plaintiff.

Mary P. Sclawy, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiff, Greyhound Financial Corporation, has filed this action for breach of an Equipment Lease Agreement against Defendant Grand Trunk Western Railroad Company (Grand Trunk). This opinion constitutes the findings of fact and conclusions of law of the Court, after trial to the bench.

The lease originated between Detroit, Toledo & Ironton Railroad Company (DTI) and Greyhound on November 16, 1973. DTI was merged into Defendant Grand Trunk on January 1, 1984, and pursuant to the merger, Grand Trunk assumed the Lease obligations of DTI. Under the agreement Greyhound leased 150 new 50 foot Pullman Common Box Freight cars to Grand Trunk, DTI's successor in interest, for a term of fifteen years, expiring on February 13, 1989. All of the boxcars had been manufactured according to DTI's specifications.

Grand Trunk leased two different types of 50' 6", 70 ton boxcars. The first type, of which Grand Trunk leased seventy-five, were "plug door series XF". The second type, of which Grand Trunk also leased seventy-five, were "sliding door series XM". Both types were constructed by Pullman Standard at a cost per car to Greyhound of $23,678.60 and $17,566.48, respectively. These boxcars bear the identification numbers GTW 11700–117074 and 16900–16974.

The lease between Greyhound and Grand Trunk provides, in relevant part:

V. SERVICE: (b) Lessee will at its sole expense at all times during the term of this Agreement maintain each Unit in good operating order, repair, condition and appearance, normal wear and tear excepted....

IX. RETURN OF EQUIPMENT: Lessee agrees, by the acceptance of each Unit, that such Unit is in good operating order, repair, condition and appearance. At the expiration or sooner termination of the term pertaining thereto, Lessee will return each Unit to Lessor free of all advertising or insignia placed thereon by Lessee *and in the same operating order, repair, condition and appearance as when received, excepting only for reasonable wear and tear and damage....* (emphasis added).

Greyhound alleges that Grand Trunk failed to keep, maintain and return the boxcars in good condition, failed to return them timely, and failed to perform repairs as required. It is Greyhound's contention that because of the foregoing, unusual wear and tear to truck components of the cars (that is, the operating parts which carry the box) occurred. For the reasons set forth herein, this Court agrees, and finds for Plaintiff in the amount of $395,142.02.

Greyhound seeks to recover the cost of placing the boxcars in good operating condition as required by all applicable regulations and laws, its losses of the income which would have been generated by the sale or lease of the boxcars had they been tendered back to Greyhound in a proper condition, storage costs, and reasonable at-

torney's fees and costs incurred in connection with this litigation.

Grand Trunk is a member of the Association of American Railroads (AAR), and therefore is bound by the standards and recommended practices concerning rail car maintenance repair and safety found in the AAR's Field and Office Manuals. All rules published in these manuals had been adopted by the Operating Transportation General Committee of the AAR. For purposes of this lawsuit, the Court will rely on the terms of the 1989 field manual, which these parties agree is applicable. Also, Grand Trunk is undisputedly bound by the rules and regulations promulgated by the Federal Railroad Administration (FRA), codified in 49 C.F.R. pt. 215 (1991), which in turn makes frequent reference to the standards prescribed by the AAR.

For a boxcar to have value to a railroad, it must be interchangeable among lines. That is, that car must be acceptable for safe movement from the tracks of one railroad to those of another. AAR Rules 88 and 89 govern the interchange of freight traffic by insuring that a car which is offered or accepted in interchange meets certain minimum standards to assure that it has no basic structural weakness or damage that would cause an unsafe operating condition on an accepting line. The Rules also assure against unfair rejections, or opportunistic making of unnecessary repairs and billing therefor.

The boxcars which are the subject of this law suit were used primarily to transport cereal, paper products and canned goods. During the Lease term, thirteen boxcars were undisputedly destroyed, at which point Grand Trunk paid Greyhound the stipulated loss value as set forth in the Lease.

The body (upper carriage) of each boxcar rests on what is referred to in the industry as a "truck". In fact, each car has an "A" truck on one end and a "B" truck on the other end. These trucks, along with the brakes, constitute the running gear of the boxcar. The truck is composed of side frames that hold the axles and wheels in place, springs, roller bearings, brakes and the bolster.

The major components of every truck, for which AAR Rules 47 and 60 specifically determine the wear limits, are the truck bolster, the bolster bowl and the body center plate. The truck bolster is the metal beam spanning the truck's two side frames. The bolster bowl is a component which rests in the middle of the bolster, from which protrudes a center pin. The body center plate fits over the center pin to rest in the bolster bowl. As these parts are not welded to each other, the weight of the car body and its load keep the upper-carriage of the car in place on the truck. The possibility of derailment is greater when these parts are excessively worn, cracked or broken, and therefore, the cars are no longer considered in a safe condition when that occurs.

Grand Trunk took most of the leased boxcars out of active service several years before the lease end and put them in storage. The majority of the 16900 series cars were put in storage in early 1980. Many of those cars were "bad order" stored, meaning that Grand Trunk had determined that the cars had defects and needed repairs before they could be placed back in service. These cars were placed in storage with the ultimate goal of being repaired before lease end.

At the expiration of the Lease term Grand trunk had the option to purchase the boxcars at their fair market value or, continue leasing them from Greyhound. Grand Trunk declined both options and instead, simply returned the cars to Greyhound tardily and without making the necessary repairs as required under Article IX of the Lease.

Article IX of the Lease required Grand Trunk to return the boxcars to Greyhound at lease end, which was February 13, 1989 for the 16900 series cars and February 17, 1989 for the 11700 series cars. However, it was not until March 20, 1990 that the last boxcar was finally tendered to Greyhound. The cars, in the neglected condition returned, could not be sold, and therefore when and as tendered, Greyhound stored

them at the Tuscola & Saginaw Bay Railroad (TSBY) in Cadillac, Michigan.

Immediately prior to the expiration of the Lease term, Greyhound had hired an independent consultant, Jerry Gregg, to inspect the boxcars outstanding to determine their condition. Gregg, who testified at trial, has been a transportation consultant for the past seven years, after a long career in the industry. He is an experienced inspector and sales/lease broker of railroad cars and equipment in the North American railroad market. Gregg's position entails conducting feasibility studies, inspections, and appraisals on malfunctioning freight cars. Gregg also performs lease end inspections to assess whether the particular car complies with the AAR and FRA.

Gregg was engaged by Greyhound to inspect the cars in early 1989. In particular, Gregg was asked to inspect the cars to ascertain whether they were in good operating condition. In the railroad industry, "good operating condition", according to Gregg, means full compliance with the standards of the AAR and the FRA. Grand Trunk's Assistant Chief Mechanical Officer, Carmen Hamilton, accompanied Gregg during his inspection, and they made lists and notes. Gregg testified that the boxcars were not in good operating order, repair, condition or appearance, excepting normal wear and tear. Specifically, he stated that several cars had body damage in the door ways, broken floors, and holes in the side sheets. 122 cars had truck damage such as bolts missing in the center cell, missing side bearings or excessive movement of the center cell. In some, the springs in the spring housing were worn on the side, and the gibs and plates were worn. All of this evidence, according to Gregg, showed extreme mechanical wear and was unacceptable for return, according to the lease.

Gregg stated that boxcars generally have a regulatory life of forty (40) years: that is, a boxcar is usually no longer interchangeable after such time. Although the usual life of a car, without undergoing a major truck overhauling, is twenty-five (25) years, it is undisputed that Grand Trunk used these new boxcars only fifteen (15) years or less.

Despite the fact that the cars when tendered technically still were approximately ten years short of needing a major overhaul, Grand Trunk returned the cars in conditions clearly violative of the wear limits set forth in 215.119 of the FRA, and Rules 47 and 60 of the AAR. In order to ameliorate these conditions it would be necessary, according to Plaintiff's witnesses, to tear down the parts, re-weld them or replace them. In particular, the bolster castings would have to be welded in order to bring them into compliance with the Rules. Many body center plates would have to be replaced.

Gregg acknowledged that some of the trucks had already had the necessary adjustments made on the bolster bowls and centerplates. However, most cars were still in violation of the tolerances for interchange under the Rules and, it was Gregg's opinion that the condition of most of these cars was far beyond the normal wear and tear permitted by the lease. As a result, Grand Trunk violated Paragraphs VI, V and XI of the Lease Agreement.

At Greyhound's request, a second independent consultant, Richard Van Buskirk, conducted another inspection of the boxcars. Van Buskirk, an experienced railroad executive and manager with expertise in the areas of mechanical operations, maintenance and fair market appraisals of railroad cars, is the Vice–President of Operations for the Detroit Mackinac Railway and the Central Michigan Railway Company (CM). After inspecting the cars, he determined that 127 of the cars were not in good operating order, repair or condition as required by the Lease, and that only 10 cars were in acceptable condition. Van Buskirk concluded that the boxcars required extensive repairs before they could be placed back in active service.

Van Buskirk compiled all findings into a consolidated report, which he mailed to Grand Trunk. Among the problems he noted were worn/broken bolster bowls, worn/broken center plates, worn bolster gibs and worn brake shoes. Van Buskirk

testified that the wear on the cars was the result of longitudinal "truck hunting." This results when the carriage, riding on the trucks of a boxcar, moves in an excessive forward and backward motion as the train travels. This causes excessive friction, wear and cracking of the bolster bowl and body center plate. The excessive wear ultimately prevents the proper rotation of the car's trucks which increases the likelihood of derailment.

Although Grand Trunk claims that the boxcars ultimately sent to storage were accepted in interchange by the CM, which is the switching point between Grand Trunk and the TSBY, Van Buskirk (the Vice–President of the CM) testified that when the 117000 series were switched, it was because Grand Trunk had specifically requested them not to inspect the cars, and they were accepted for movement directly to storage.

Plaintiff's witness, Daniel Krieger, a carman for the CM, was responsible for ensuring that boxcars are in good usable condition. Specifically, he testified that it was his responsibility to make sure cars accepted in interchange were in compliance with the AAR rules. It was his opinion that had the CM inspected the cars for interchange violations at the switching point, all but ten cars would have been condemned by the CM.

In December 1989, Krieger used a measuring device, marked with a red and yellow line, and a tape measure on the cars at issue to ascertain the distance between the bolster bowl and center plate. If the distance between the two exceeded two inches, the car was no longer in conformity with AAR rules 60(a)(1) and 60(a)(2)(c). Krieger spent approximately 15 minutes on each car and concluded that the majority of cars were not interchangeable. Upon compiling his findings, he sent this report to Van Buskirk.

Article V(b) expressly states that, at the expense of the Lessee and at all times during the term of the Agreement, Lessee will "maintain each Unit in good operating order, repair, condition and appearance, normal wear and tear excepted". It was

the testimony of both independent consultants, that the most common problem with the boxcars are that they have cracked or excessively worn truck bolster bowls and body center plates. These are serious defects which affect the safety of the cars, precluding them from being interchangeable. Moreover, the consultants opined that these are not "normal" or "reasonable wear and tear", and indeed, were not in the condition they should have been at the expiration of the Lease term.

The Assistant Chief Mechanical Officer for Grand Trunk, Carmen Hamilton, testified that the condition of the boxcars was the result of ordinary wear and tear. Hamilton was responsible for the maintenance and repair of the boxcars during the lease term. Although Hamilton acknowledged that he follows the limits as set forth by the AAR when making such repairs, he stressed the point that these are "guidelines" and not "requirements". The AAR Rules set the standards for determining the point at which the accepting railway *may* make repairs legally and bill the owners for the work. In other words, the function of the guidelines of the AAR is to limit Grand Trunk from making unnecessary repairs on a *non* Grand Trunk boxcar by preventing Grand Trunk from billing another railroad for premature repairs or repairs not necessarily needed at that time. If Grand Trunk did not bring the cars within the confines of the AAR, it merely meant to him, that the cars were not interchangeable. The court, however, found Plaintiff's witnesses to be more credible.

Hamilton admitted that the interference between the truck bolster and body center plate was not only violative of FRA Section 215.112, but of AAR Rules 47 and 60 as well. Although Hamilton conceded that maintenance of these cars does include repairing or replacing the body center plates, bolster bowls, and side bearings, he testified that he did not believe that the AAR Rules govern Grand Trunk's obligations under the lease.

On the contrary, courts frequently have been willing to find the safety codes of a particular industry authoritative. In an ac-

tion brought against an oil company and others, the Court in *Frazier v. Continental Oil Company, et. al.,* 568 F.2d 378 (5th Cir.1978) addressed the issue of the admissibility of information contained in the National Fire Protection Association (NFPA) Code which contained a consensus of industry opinion. The court stated:

> "The requirement of trustworthiness of the information contained in safety codes such as that published by the NFPA is satisfied by the fact that such organizations are formed for the chief purpose of promoting safety, and the materials they publish generally represent not merely the opinion of one expert in a particular field but 'a consensus of opinion carrying the approval of a significant segment of an industry.'" *Id.* at 382.

In the present case, Plaintiff produced expert testimony of two consultants, Jerry Gregg and Richard Van Buskirk, who both stated that "good operating condition" meant that the cars were in compliance with the rules and regulations set forth by the FRA *and* AAR. The record discloses that these experts were well qualified in the locomotive field, and the court found their testimony most persuasive. As was mentioned previously, the AAR rules were enacted by the Operating Transportation Committee which oversees all committees relating to locomotives and their interchange within the AAR. The Operating Transportation Committee must, therefore, be comprised of the leadership of the railway industry, and the Court finds the AAR Field Manual authoritative as it pertains to the proper maintenance and repair of boxcars and in interpretation of the requirements of the Lease.

Both experts, Gregg and Van Buskirk, testified that in order to insure proper truck rotations, AAR Rules 47 and 60, which govern the maintenance and care of truck bolsters and body center plates, require proper clearance between the truck bolster and center plate. In particular, the AAR Rules state:

Rule 47—TRUCK BOLSTERS

A. Wear Limits, Gaging, Cause of Renewal

4. Center Bowl—

a. The difference in diameters of body center plate and truck bolster bowl exceeding 1⅜"; however, the maximum worn bolster bowl diameter must not exceed 12⅞" (for a 12" diameter bowl), or 14⅞" (for a 14" diameter bowl), or 16⅞" (for a 16" diameter bowl).

Rule 60—BODY CENTER PLATES

A. Wear Limits, Gaging, Cause for Renewal

2. Worn:

c. Total clearance between truck and body center plate diameter exceeding 1⅜".

d. ¹⁄₁₆" clearance between truck bolster rim and body center plate must be maintained.

As set forth in the above rule, there should be no more than a 1⅜" difference between the diameters of these two components at all times. Also, a ¹⁄₁₆" clearance must be maintained between the truck bolster bowl rim and the body center plate base. If proper clearances are not maintained, the AAR Rules make them unacceptable for interchange.

Moreover, FRA Section 215.119 of Title 49 prohibits a railroad from placing or continuing a car in service which has interference between the truck bolster and the center plate that prevents proper truck rotations. Nor may a car continue in service if it has a broken or cracked side frame or bolster under this Section.

Based on their inspections of the boxcars, the body center plates and truck bolster bowls on over 100 cars were either broken, cracked or worn beyond acceptable AAR wear limits. The experts presented numerous photographs, subsequently marked as Plaintiff's exhibits, depicting worn or broken car parts.

Indeed, at the end of his inspection of the boxcars, Van Buskirk determined that 127 cars were not in good operating order, repair or condition, with the most common problems being missing side bearing bolts, worn gibs, worn brake shoes, missing bear-

ing rollers, and inadequate side bearing clearance. Furthermore, Greyhound submitted evidence that at least 40 of these boxcars were rejected in interchange by the TSBY.

■ In an effort to avoid liability, Hamilton testified that if there had been a market at the time for the boxcars that were "bad ordered" stored, they would have made the necessary repairs to return them to active service. In fact, Grand Trunk did rebuild or replace the center plates and bolster bowls on several cars upon request by a customer. However, because the majority of the cars were not in demand, Grand Trunk failed to repair them. Hamilton suggested that the railroad method of transporting goods has become obsolete because "truckers are taking away a lot of the business". In light of the declining market for boxcars and rather than repair the cars, Grand Trunk chose to place the cars in storage, notwithstanding the provision in the lease requiring it to maintain each boxcar in good operating order, repair, condition and appearance "at all times".

In *Haeberle v. Texas International Airlines*, 738 F.2d 1434 (5th Cir.1984), the leased airplanes were to be returned in their original condition, reasonable wear and tear excepted, upon expiration of the lease. Additionally, the Defendant, Texas International, was responsible for making all necessary overhauls, replacements and repairs on the aircraft in compliance with Federal Aviation Administration regulations regardless of whether the aircraft were being operated or were in storage.

When the leases expired, however, Texas International notified the leasing companies that it had taken the leased aircraft out of service a year prior to expiration and placed them in storage. No ongoing maintenance or repairs were performed while the airframes were in storage. The court held that Defendants could not avoid making repairs or replacing parts merely by putting the aircraft or their parts in storage until the lease end. *Id.* at 1438.

Likewise, in the present case, Grand Trunk may not avoid liability solely based on the fact that it no longer chose to use those particular boxcars when the express provisions of the lease mandate otherwise. It was required under the lease for Grand Trunk to return the cars in good operating condition. Therefore, this Court finds that Grand Trunk's failure to do so is a breach of the Lease, as Plaintiff has claimed.

As the market now stands, each box car is worth only its scrap value, which according to Gregg is approximately $100 per ton or $2,600 per boxcar. The Court does not believe, however, that Grand Trunk's breaches have irreparably compromised Greyhound's ability to market the boxcars in the future.

Inasmuch as Plaintiff seeks to recover, as one alternative, the cost of restoring the boxcars to good operating condition as required by all applicable regulations and laws, the Court awards Greyhound its repair costs which according to Van Buskirk are $246,000.

It is noteworthy that there would have been a market for the cars if they had been tendered timely at lease end (February, 1989), in good operating condition. Gregg personally recalled a sale of 250 similar cars in December, 1988 valued at approximately $10,000 per car. Moreover, Van Buskirk testified that the CM had sold 125 such cars in March, 1989 for $21,000 per car. Therefore, the cars could have been sold for as much as $1,145,000.

Article X(a) of the Lease provides, in relevant part:

[S]hould Lessee ... fail to perform at the time and in the manner herein specified any term or covenant in this Agreement or any Schedule or supplement hereto ... Lessor, at its option, may proceed by appropriate court action or actions ... to recover from Lessee, any and all damages or expenses including reasonable attorneys' fees, which Lessor shall have sustained by reason of Lessee's default in any covenant or covenants of this Agreement....

■ The Court finds that Greyhound is entitled to recover lease payments for the 90–day period beyond the Lease expiration

in which Greyhound exercised its right under the Lease to store the two series on the Grand Trunk, or from February 13, 1989 (16900 series) and February 17, 1989 (117000 series) until May 14, 1989 and May 18, 1989, respectively.

Section II(a) of the lease provides, in relevant part:

... If any such term be extended, the word "term" or "period" as used in this Agreement, shall be deemed to refer to the extended term, and all provisions of this agreement shall apply during and until the expiration of said extended period, except as may be otherwise specifically provided in this Agreement or in any subsequent written agreement of the parties.

Upon expiration of the Lease, the per diem lease charge was $7.86 for each 117000 series boxcar and $5.83 for each 16900 series boxcar. As such, the cars in aggregate were tendered to Greyhound 18,748 days late. Therefore, Greyhound is entitled to recover $115,646.62 in past due rent owed to it as a result of Grand Trunk's failure to timely tender the boxcars.

Grand Trunk finally tendered most cars to Greyhound in August 1989. However, because of the poor condition of the cars, Greyhound was compelled to store the cars at the TSBY. Marilyn Petrina, Manager of Equipment Sales for Greyhound, testified that she received storage invoices relating to the placement of the boxcars at the TSBY from June, 1989 through September, 1991 totalling $33,495.40. Therefore, the Court awards Greyhound these storage costs for the relevant time span.

The Court in *Central Transport v. Fruehauf,* 139 Mich.App. 536, 362 N.W.2d 823 (1984), held that contractual provisions for payment of reasonable attorneys' fees are judicially enforceable. *Id.* at 548, 362 N.W.2d 823, *citing, Michigan National Leasing Corp. v. Cardillo,* 103 Mich.App. 427, 436, 302 N.W.2d 888 (1981). Thus, in light of the case law and express provision in Article X of the Lease, the Court must award Plaintiff attorney's fees, the amount of which will be determined at a later date.

ACCORDINGLY, IT IS ORDERED AND ADJUDGED that Plaintiff Greyhound Financial Corporation shall recover the sum of $395,142.02 from Defendant Grand Trunk Western Railroad for damages sustained as a result of Defendant's breach of the terms of the equipment lease agreement.

IT IS SO ORDERED.